The Screw Products Corporation of America, Inc. vs. John A. Arenz } Eq. No. 8289.

December 11, 1931.

BAKER, J. Heard on amended bill, amended answer, replication and proof.

The respondent in this case had a contract of employment with the complainant corporation. The relief sought in the bill is, first, that the respondent be required to cancel his notice of his intention to cancel said contract and that the complainant be reinstated in its rights under the contract; further, that the respondent be enjoined from transferring, assigning, encumbering, or in any way interfering with the rights of the complainant in and to certain patent applications and patents; further, that the respondent be restrained from interfering with the complainant in the making, using and selling of the inventions covered by the applications and patents, and finally, that the respondent be ordered to execute the necessary documents to remove any clouds upon the right of the complainant to make use of any of said inventions.

The basis of the bill is that the contract above referred to was entered into and attempted to be carried out following certain alleged frauds and misrepresentations on the part of the respondent in matters about which the complainant had no knowledge and upon which it relied to its loss and damage.

Some of the more important facts of the case are as follows: Early in 1925, the respondent was employed in the sales department of the Interstate Iron & Steel Company, with which he had a contract relating to the manufacture and sales of double thread, double point screws under a certain patent known as the Caldwell patent, controlled by him. Mr. Arenz for some time had been experimenting with

screws and had invented a double thread, single point screw for which he had filed patent application. Early in the year 1925, he came in contact, more or less casually and accidentally, with a Mr. De Vellier of Alexander Otis & Co., promoters and industrial engineers. As a result of this acquaintanceship, following correspondence and negotiations, an option agreement, which apparently was prepared by a Mr. Straub, an attorney connected with Mr. De Vellier, was executed by Mr. Arenz in June 1925, to a man named Hoffacker. This option agreement was never taken up. Later, through the activities of Mr. De Vellier and Mr. Straub, various business men of Taunton, Massachusetts, became interested in the production of the new double thread, single point screw, and in November, 1925, after numerous conferences and much correspondence, Mr. Arenz executed an option agreement in their favor. In the latter part of October and early November, 1925, a corporation was formed in Massachusetts to manufacture these new screws. Two Townsend screw machines were purchased and one of them was sent, in December, 1925, to Mr. Arenz to be changed so that it could be used in turning out his new screws. In January, 1926, there was certain correspondence with the Manville Company in relation to the Interstate Company having an exclusive right on machinery to point and cut double thread screws. In this connection Mr. Arenz expressed his views and opinions as to these rights.

In May, 1926, a contract of employment, the one involved herein, was executed between the complainant corporation and the respondent and certain payments of money were made to the latter. According to the terms of this contract, the respondent's patent rights were not turned over to the complainant, but the latter merely obtained the right to manufacture under said patent applications.

Alexander Otis & Company thereafter conducted a campaign in and about Taunton for the purpose of selling stock in the new corporation. In the latter part of July, 1926, Mr. Arenz gave up his position with the Interstate Iron & Steel Company and came to Taunton to assist in getting the new corporation running, as called for under his contract. Thereafter, on August 5, 1925, 50 screw machines were ordered from the Townsend Company and a small payment was made on account. About the middle of August, Mr. Townsend came to Taunton to talk matters over with the officers of the company, and on August 23rd the order above referred to was cancelled. In the meantime, on August 18th, respondent had correspondence with the Cooke Company in connection with screw machines and received quotations. Not long after this the Townsend Company brought suit against the complainant because of the cancellation of the order and attached all its funds. Certain payments were made to Mr. Arenz by complainant during August and September, but the payment of $7,500 due under the contract on October 1st was not made him. On October 21, 1926, Mr. Arenz gave notice that he would cancel his contract and after ninety days, no action having been taken by the complainant, by letter dated January 18, 1927, he gave final notice that the contract had been terminated. On the same date certan patent applications were transferred by him to his wife and later a new corporation was organized under the laws of the State of Delaware. The present suit was begun January 19, 1927, and in August of that year a receiver for the complainant corporation was appointed in Massachusetts.

The evidence further shows that under the contract involved herein, Mr.

Arenz was paid by the complainant approximately $20,000, as follows: three monthly salary checks of $700 each, $17,500 on account of the $25,000 due him according to the terms of the contract, and the rest in smaller checks to cover expenses.

The complainant's first claim, in relation to the fraud which it says Mr. Arenz perpetrated, relates to the formation of the option agreement and final contract between the parties and, in particular, concerns the alleged use by Mr. Arenz of a false contract with the Interstate Company which the complainant says became the basis of the contract involved herein.

The complainant urges very strenuously that by oral statements as to his arrangement with the Interstate Company and by the production of a document which purported to be a signed contract wth that company, Mr. Arenz induced it to enter into the contract now in suit. The complainant's claim is that the respondent removed the last page, containing the signatures of himself and the officers of the Interstate Company, and attached thereto an entirely different set of pages containing terms and figures materially different from the actual contract between himself and the Interstate Company and insisted that this false contract was the true contract.

The respondent denies any such action on his part. The evidence on this question is very conflicting. Several apparently reliable witnesses support the complainant's contention in this connection. The respondent relies chiefly on his own testimony, that of his wife, and such inferences and deductions as may be drawn from the frame and scope of the option and contract herein. The respondent's claim is that the Hoffacker option and not the Interstate contract was the basis for the option and contract now involved in this case.

This question brings the Court to a consideration of the amount of credibility to which the respondent's testimony is entitled. Mr. Arenz was not a good witness. His manner on the stand was bad. He could not refrain, whenever an opportunity offered, from attacking in rather intemperate language the officers of the complainant corporation, Mr. Townsend, Mr. De Vellier, and others. His feeling and bias were clearly shown. His credibility was severely shaken by the testimony of numerous witnesses involving different points in the case. In this connection, the Court may refer to the evidence of Mrs. Leonard, Mr. Clark, Mr. Crosby, Mr. Straub, Mr. Townsend, Mr. Howe, and others. The evidence offered would tend to show, in the judgment of the Court, quite clearly that either Mr. Arenz or someone on his behalf, had made photostatic copies of alleged corporation records which had been tampered with. The original corporation records were produced by the complainant and in many respects were so virtually different from the alleged photostatic copies tendered by Mr. Arenz that the Court can give absolutely no consideration to such copies. The same thing applies in a lesser degree to the testimony relating to the financial statements of the company. The respondent evidently desired to prove to the Court that he took little or no part in the management of the corporation and obviously sought to show that whenever anything of importance took place, he was absent. He failed to substantiate this contention.

Toward the end of the case, the contract between Mr. Arenz and the Interstate Company was finally produced. This revealed that the last page only of this contract had been backed with canvas and had been varnished. Mr. and Mrs. Arenz's explanation of this did not impress the Court as being the truth. Further, the difference in creasing between the last page of the contract containing the

signatures and the other pages was a matter of some interest, and deductions can be made therefrom.

The total result of this mass of testimony and the exhibits produced is that the Court feels that it can place little or no reliance on the respondent's evidence, and therefore grave doubt is thrown upon his testimony in relation to the use made by him of his contract with the Interstate Company, particularly in view of the absolutely contradictory testimony of several other witnesses.

On the other hand, the evidence produced on behalf of the complainant should be scrutinized carefully. It appears beyond much dispute that it was Mr. De Vellier who pursued Mr. Arenz, after the former had learned about the new double thread, single point screw, in regard to interesting capital and forming a new company, rather than Mr. Arenz taking the initiative. The Court does not feel that it can be fairly said that Mr. De Vellier was acting in any way as an agent for Mr. Arenz, who at that time had a very good position with the Interstate Company. The testimony shows that Mr. De Vellier and the men in Taunton were not entirely without personal interest in the matter. Mr. De Vellier was the promoter, obtained a large block of stock and commissions on all stock sales. Further, he was obviously anxious to dispose of the plant of the Nelson Machine Company in Taunton, which had been occupied by the defunct Romer Automobile Company, in which he had been interested. Further, the men in Taunton were anxious to obtain a new industry for that city and quite obviously Mr. Pierce, who was the receiver of the Nelson Machine Company, wanted to find some occupant for that plant.

After giving careful consideration to all the testimony bearing upon the matter of the giving of the option and the formation of the contract in this case, and drawing reasonable deductions therefrom, and considering the probabilities, the Court is of the opinion that the complainant's contention that the respondent did make use, during the negotiations, of a false Interstate Company contract, has been supported by a fair preponderance of the testimony. Mr. Arenz's object undoubtedly was to get as favorable a contract for himself as he possibly could with the new company. Just how much influence this false contract had with the men then interested in the complainant corporation, it is, of course, impossible to say, but the Court is inclined to the belief that they were influenced thereby to some extent in preparing the terms of the contract involved herein. It is very possibly true, as the respondent argues, that certain parts of the Hoffacker option entered into the present contract. Both were drawn by Mr. Straub and some of the elements of the agreement involved herein bear a resemblance to those in the Hoffacker option. In the judgment of the Court, both the false Interstate Company contract and the Hoffacker option played some part in the negotiations. This being so, the Court is of the opinion that the use of this false Interstate Company agreement by the respondent constituted fraud in some degree against the complainant corporation.

The complainant further urges that the respondent was guilty of fraud and misrepresentation in connection with the obtaining of machines necessary to produce the screws for the new company. It is contended that the respondent from the very beginning knew that he would not be able to obtain machinery to turn out these screws. Mr. Arenz, however, has always claimed that the necessary machines could be obtained without infringing on anyone's rights or patents. Apparently this matter was more or less brought to a head by Mr. Townsend when he came to Taunton in the

middle of August, 1926, just before the order given his company for 50 machines was cancelled. The Court does not think that either this order or its cancellation can be laid entirely at Mr. Arenz's door. The order was apparently authorized at a regular meeting of the directors of the corporation and while there is some dispute about the cancellation, the letter bringing it about was signed by Mr. Pierce. An examination of the evidence, and particularly the correspondence with Mr. Crosby of the Cooke Company, leads the Court to believe that very possibly machines could have been furnished the complainant by that company. Further, while it is true that Mr. Townsend was making claims in August, 1926, in regard to infringement on the rights of the Interstate Company, it is perfectly obvious that the matter was entirely open and that Mr. Arenz's opinion was as good as anyone's else. It was not until June, 1930, that Mr. Townsend's dispute with the Manville Company was settled and he was granted certain patent rights. Furthermore, the machinery then being made was for double thread, double point screws, and Mr. Arenz and everyone else anticipated that whatever machines were bought would have to be altered so as to produce double thread, single point screws, which changes were apparently feasible and not particularly expensive.

In this connection it is necessary also to consider the financial condition of the complainant corporation in the latter part of July, when the respondent gave up his position with the Interstate Company and came to Taunton. It is quite clear from the evidence, from the figures produced, and from the record books, that the stock-selling financial campaign under the auspices of Mr. De Vellier was not going very well. By the last of July, 1926, money had practically stopped coming in and very few sales were made thereafter. Clearly the corporation did not have sufficient resources to function properly and it cannot be said that this was the respondent's fault. It would seem that the complainant was in the somewhat anomalous position of not being able to buy machinery because it lacked funds, and it could not get money and sell stock because it had no machines to show production. On this issue, after weighing all the testimony, the Court has come to the conclusion that the complainant has not proved by a fair preponderance of the evidence that the respondent Arenz was guilty of any fraud or misrepresentation toward the complainant in connection with the obtaining of machines or the production of screws.

This being the situation in October, 1926, one salary check having been returned by reason of the Townsend attachment on the corporation funds, and the payment of $7,500 due him October 1 not having been made, the Court is of the opinion that Mr. Arenz, if he saw fit, had the right to give preliminary notice to cancel the contract. During the ninety days which followed, the complainant apparently did nothing to straighten matters out, and the Court believes that the respondent could properly cancel the contract in January, 1927, and did as a matter of fact exercise that right, and that, therefore, the contract between the parties was terminated.

Granting that there was some misrepresentation on Mr. Arenz's part in the formation of the contract, as hereinbefore discussed, the question then is whether the complainant is entitled to any relief under its amended bill as drawn. It should be noted that this bill does not ask for rescission of the contract, as is perhaps usual where fraud is charged, but, on the other hand, asks that the parties be reinstated and desires certain injunctive relief in connection with the patent rights. It would seem that this amend-

ed bill in effect is a bill for specific performance in a negative form. The usual remedy for fraud or deceit is not that prayed for in this amended bill. Ordinarily, relief is asked for on the law side of the Court, or sometimes rescission with damages. The complainant herein contends that in equity there is the maxim that there is no wrong without a remedy.

21 C. J. page 198.

It clearly appears, however, that the next section following the stating of this general rule shows its limitations.

See also in this connection *Greene* vs. *Keene*, 14 R. I. 388.

It is quite obvious that before an equity court can grant relief, the subject matter before it must come within some well-recognized equity principle.

The complainant has also referred the Court to certain cases in which the negative remedy by way of injunction has been applied to bring about substantial justice between the parties where, however, the Court has refused to decree specific performance.

*American Electrical Works* vs. *Varley & Co.*, 26 R. I. 295;

*Singer Sewing Machine Co.* vs. *Union Buttonhole & Co.*, Fed. case No. 12904;

*Standard Fashion Co.* vs. *Siegal-Cooper Co*, 157 N. Y. 60.

While these cases undoubtedly recognize a well settled principle of relief, the Court believes that they are not applicable to the situation now before it. They would seem to depend on their own peculiar state of facts.

Specific performance usually rests in the sound discretion of the Court hearing the case. It is a well settled principle of law that a Court will not compel specific performance of contracts for personal services, especially where they are difficult to enforce and require great and continuous oversight. The contract involved in this case on the part of the respondent was for personal services. Further, spe-

cific performance will not be ordered where the complainant is not in a position to perform its part of the contract.

*Smart* vs. *Boston Wire Stitcher Co.*, 50 R. I. 401;

*Electric &c. Co.* vs. *Gill-Alexander & Co.*, 125 Mo. 140;

*Merry Realty Co.* vs. *Shamokin & Co.*, 230 N. Y. 316;

*Rice* vs. *D'Arville*, 39 N. E. 180;

Pomeroy on Specific Performance, 3rd ed. p. 721.

It is perfectly obvious that the complainant is not now in a position to perform its part of the contract. It has little or no funds and is in the hands of the receiver. The contract called for an employment covering ten years. The complainant does not even offer to perform its part of the contract and it is quite clear that the parties cannot on the facts be reinstated.

If the complainant by reason of any fraudulent conduct on the part of the respondent had a right to bring a bill to have the contract rescinded, it would seem that in this case it has elected to bring its bill to enforce the contract and waived whatever rights it may have had as to a rescission, which now apparently it does not desire.

*Quinn* vs. *Drummond*, 47 R. I. 215;

21 C. J. 682;

Vol. 6 R. C. L. 935;

Vol. 2, Black on Rescission, Sec. 516;

Vol. 2, Pom. Eq. Jurisprudence, Sec. 897.

After careful consideration, the Court is of the opinion that on the record as presented the complainant cannot be given the relief which it now asks in its amended bill as framed. The testimony seems to reveal a situation where the downfall of the complainant corporation was due not to any one person, perhaps, but to the development of a situation in which all the various parties interest-

ed were somewhat to blame. That being so, an equity court will let the loss remain where it falls. While it is true the complainant's stockholders parted with considerable money and received little for it, on the other hand the respondent gave up a position with the Interstate Company, took one with the complainant which lasted only a short time, has been in litigation ever since, and has had his patent rights so tied up that he could make no use of them.

The remaining matter for consideration relates to the so-called settlement agreement. In October, 1927, the parties hereto attempted to settle this litigation and the respondent agreed to pay to the complainant company and its receiver the sum of $4,000 by April, 1928.

The respondent's claim is that a portion of this agreement was oral and a portion written. The oral part was with the complainant corporation and its officers and the written portion with the receiver appointed by the Massachusetts Court. This receiver has no particular standing in the case now before the Court. The present suit was brought by the corporation itself and no receiver has ever been appointed in this State. Under the law it is quite clear that a foreign receiver is only recognized by way of comity.

Haslett vs. Woodhead, 28 R. I. 452.

This agreement has never been carried out. The complainant contends that after it was made the respondent absented himself for a long period of time and could not be found, so that the complainant was unable to consult with him about several matters of importance that arose regarding certain machines. It would tend to appear that at this particular time the respondent had an attorney in Fall River representing him, however. In April, 1928, the respondent was not in a position to pay the $4,000.

He contends that this was because of the acts of the complainant corporation in having him indicted in Massachusetts, so that he had difficulty raising money in Canada, where he had a project under way. He also claims that the complainant shipped to Canada certain machines in New York when the understanding was that he was to have some of these for demonstration purposes in order to assist him in financing the settlement. The testimony would tend to show that he had at that time certain persons interested in his double thread, single point screw. The complainant answers in regard to the machines by saying that they were under a chattel mortgage, that the mortgagee would not release, that they were sold to cover mortgage and storage charges and were later shipped to Canada, and that the receiver merely undertook to use his best endeavors to obtain a release of the mortgage and did not guaranty to do so.

The Court is inclined to think that the respondent has some just complaint in connection with the corporation's actions in this matter. There seems to be some question as to whether it was absolutely necessary to sell all the machines to cover the mortgage and storage charges, neither of which was very large. There is no question but what the complainant's and the receiver's actions hampered the respondent in his raising of the $4,000. In November, 1928, he finally notified the complainant and the receiver that he was ready to pay the money in settlement of this case. Some negotiations and correspondence then followed. In December, 1928, there was a hearing before the Massachusetts Supreme Judicial Court, at which objections were raised and the Court refused to permit the receiver to make the settlement. Thereafter, in January, 1929, the money was formally tendered and refused.

An examination of all the evidence

would lead the Court to believe that an agreement of settlement was made between the respondent and the complainant corporation. Although the respondent was late in producing the money, when it was finally forthcoming, the receiver and the complainant corporation refused to go through with the settlement agreement. The receiver's position is explainable, because the Massachusetts Court, after a hearing, refused to sanction the agreement. The position of the complainant corporation in November, 1928, when the money was offered, was that it desired more and attempted to get the respondent to make a new offer. The reason for this is quite plain. Since October, 1927, patents have been issued to the respondent on what had previously been mere applications and undoubtedly the respondent was in the possession of rights of a much greater value. This situation also probably accounts for the frame of the present bill which asks for a reinstatement of the parties, or, in substance, specific performance of the agreement instead of a rescission.

The respondent is still offering to go through with his settlement agreement if necessary. The complainant, however, contends that there was no valid agreement and if there was one, it was not kept by the respondent, and therefore refuses to further consider it and apparently stands squarely on its rights under its bill. In view of this position by the complainant corporation, the Court does not see why it should attempt to force the agreement on the complainant against its obvious desires.

On the whole case, therefore, the Court is of the opinion that applying the evidence to the bill as drawn the complainant is not entitled to relief. The prayers of the bill are denied and it is dismissed.

For complainants: Tillinghast, Morrissey & Flynn.

For respondent: Gardner, Moss & Haslam.